UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                                   :
T-JAT SYSTEMS 2006 LTD.,                                           :
                                                                   :
                                                                   :  No. 1:13-cv-5356 (JMF)
                        Plaintiff,                                 :
                                                                   :  **T-JAT'S REPLY TO**
        -v-                                                        :  **AMDOCS's OPPOSITION TO**
                                                                   :  **T-JAT's MOTION TO VACATE**
AMDOCS SOFTWARE SYSTEMS LIMITED et al.,                            :  **A PORTION OF THE**
                                                                   :  **ARBITRATION AWARD**
                        Defendants.                                :
                                                                   :
------------------------------------------------------------------ X

## I. INTRODUCTION

In its opposition, Amdocs mounts an attack on T-Jat's recitation of the record. In the course of this attack, Amdocs seeks to substitute a counter-version of facts. But it is Amdocs's counter-version that is faulty; it should not be relied on, absent careful scrutiny. Two examples:

First, Amdocs contends that T-Jat should be precluded from recovering under the NDA for failing "to mark -- as the NDA required -- *any* information as confidential." Amdocs Opp'n at 20 (emphasis added). We are puzzled as to how Amdocs can characterize the record as demonstrating that T-Jat failed to mark *any* information. The reality is that T-Jat did mark numerous key documents "Confidential."[1] The confidentiality was so clear to Amdocs that Amdocs itself -- when authorized by T-Jat to pass along T-Jat's UCL proprietary information in a proposal to a SingTel company -- marked that proposal "Confidential." Ex. L.

Second, as one of five "egregious examples" of T-Jat's alleged mischaracterization of the record, Amdocs Opp'n at 10, Amdocs points to T-Jat's assertion that Amdocs wanted to "market" T-Jat's system. *Id*. at 12. According to Amdocs, that is an egregious false statement because "Amdocs is not a marketing company." *Id.* Petty inconsequentiality aside, Amdocs signed an agreement in February 2011 with T-Jat, with the stated purpose "to provide the parties

---

[1] For example, T-Jat shared with Amdocs a 109-page document entitled "TJAT-FUSE Integration XML API Specification" which lays out, among other things, the functionalities of T-Jat's system. Each page of this document includes the footer: "This document contains proprietary and confidential material of Tjat." Ex. Y. There are numerous additional marked documents that were not introduced as exhibits at the arbitration hearing, but support the same point. *See* Ex. Z (E-mail and attachment Tjat FUSE System Data Encryption Explanation Document); Ex. AA (E-mail and attachment Tjat FUSE System Operations Guide (July 2012)); Ex. BB (E-mail and attachment Tjat Unified Contact List: Trial Proposal Optus Australia); Ex. CC (E-mail and attachments (1) Tjat Fuse API ATP, Draft 1 (Apr. 2012), (2) Tjat FUSE System Installation Guide (May 2012), (3) Tjat FUSE System Operations Guide (June 2012), and (4) Tjat Technical Handbook (June 2012)).

Amdocs cites *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.,* 2014 WL 812820 at *21 (S.D.N.Y. Mar. 3, 2014), in support of its argument that T-Jat's failure to mark documents bars an NDA claim. Aside from the fact that key documents in this case were marked, *Big Vision* involves a very different NDA. There, the requirement to mark was included in the very definition of "proprietary information." Here, by contrast, Amdocs -- the drafter of the NDA -- chose to include the marking requirement in a distinct section and not to include it as part of the definition of proprietary information. Thus any unmarked information still retains its status of "proprietary information."

with a commercial framework for *marketing* . . . [T-Jat's] proprietary products . . . by Amdocs." Ex. DD at introductory paragraph prior to ¶ 1 (emphasis added).  Indeed, the agreement has an entire section labeled, "Marketing." *Id.* at ¶ 2.

We will provide other examples of Amdocs's flawed counter-version throughout this brief. This brief is in two parts. The first sets forth why the award should be vacated and why Amdocs's arguments against the "manifest disregard" doctrine should be rejected. The second sets forth the authority of the Court, upon vacating the award, to determine on its own and *without remand to arbitration*, that there was breach of the NDA.

## II. THE AWARD SHOULD BE VACATED FOR "MANIFEST DISREGARD"

### A. T-Jat Distinguished the NDA Claim from the Trade Secret Claim by Setting Forth Each as a Distinct Cause of Action with Distinct Elements

Amdocs argues that T-Jat, not the Arbitrator, conflated the two claims when it set forth facts that "were the same for both the trade secret and NDA claims." Amdocs Opp'n at 2.[2]

Yes, T-Jat set forth the same array of facts in support of all of its claims. So what? T-Jat alleged that this array of facts gave rise to numerous distinct causes of action, including a breach of the NDA and misappropriation of trade secrets. *The Arbitrator should have separately analyzed each element of each distinct cause of action, including the NDA claim, taking into account all the terms comprising proprietary information, to determine whether T-Jat satisfied its burden of proof.* In its pre-hearing brief, T-Jat laid out the elements of an NDA breach of contract claim, Amdocs Opp'n Ex. 7 at 8, and then the very different two elements of a trade-secret misappropriation claim. *Id.* at 17. Because the elements were shown to be plainly different, and because the NDA here defines proprietary information far more broadly than just

---

[2] *See* Amdocs Opp'n. at 17 ("T-Jat repeatedly relied on the same set of facts in prosecuting its trade secret, copyright and NDA claims.").

"trade secrets," the Arbitrator should have measured the facts not only against the elements of a trade secret claim, but also the elements of the very different NDA claim.

Amdocs notes that T-Jat's expert addressed only "T-Jat's trade secret and copyright claims, and did not distinguish or separately identify any additional claims under the NDA." *Id.* at 16.  But T-Jat's expert, Stephen Gray, is an expert on copyrights and trade secrets, not NDAs.  It cannot be that the failure to have him testify about the NDA cause of action (for which he may have lacked expertise) implies that T-Jat waived a distinct NDA claim.

As part of its argument that T-Jat itself limited its NDA claim to trade secrets, Amdocs notes that T-Jat, in quoting the NDA in its Post-Hearing Reply Brief, italicized the phrase "trade secrets."  *Id.* at 17.  Whatever validity this waiver-by-italicization argument might otherwise have, Amdocs fails to disclose that T-Jat also quoted the same passage of the NDA *without any italicization*.[3]  The only inference to draw from T-Jat's italicization of "trade secrets" is that T-Jat wanted to show that trade secrets were doubly protected, both by the ordinary protections for trade secrets and by the NDA.  Had T-Jat sought to limit its NDA claim to trade secrets it would have quoted only "trade secrets," omitting the other terms entirely.

**B.    The Arbitrator's Finding of No Misappropriation Extended Only to Trade Secrets, Not Proprietary Information**

Amdocs argues that the Arbitrator properly treated the NDA claim and trade-secrets claim as one because they were both determined by the same alleged findings of fact, i.e., that

---

[3] In the Second Amended Statement of Claim, in the very section entitled "AMDOCS BREACHES THE NDA AND LICENSE AGREEMENT," T-Jat alleged as follows *without any italicization*:

> It took T-Jat over six years to develop the UCL technology and the millions of networks connections.  Amdocs, on the other hand, developed its copycat software in less than a year and only after having direct access to T-Jat's "valuable proprietary routines, computer programs, documentation, trade secrets, systems, methodology, [and] know-how," i.e., T-Jat's Proprietary Information.  (NDA at 1.)

Ex. R at 10 (footnote omitted).

4

"Amdocs never used any T-Jat technology or information in the development of the UC," Amdocs Opp'n at 18, and "that the UC was independently developed by Amdocs and without *any* misappropriation from T-Jat or any other entity." *Id.* at 24 (emphasis in original). But this description of the findings is simply inaccurate.

Here is what the Arbitrator actually found:  He rejected "T-Jat's claim of trade secret misappropriation" (followed by the footnote indicating that he viewed the NDA claim as "identical" to the trade secret claim).  Ex. C at 16.  This was a factual finding focusing only on trade secrets, nothing more.  Nowhere did he find that "Amdocs never used any T-Jat technology or information in the development of the UC," or "that the UC was independently developed by Amdocs and without any misappropriation from T-Jat or any other entity."

Amdocs pulls phrases out of the award to argue to the contrary.  It repeatedly quotes the Arbitrator's language that Amdocs "developed UC in-house, without using third parties." Amdocs Opp'n at 2, 4, 10.  True, Amdocs did develop the knockoff in-house without using third parties.  But all the Arbitrator was conveying there is that in contrast to Fuse/LoopMe, for which there were multiple parties involved, Ex. C at 4, the development of the knockoff was achieved in-house, i.e., without using any third parties.  But a finding that Amdocs developed the UC by itself, does not address the issue of whose information Amdocs used.

Another phrase Amdocs twists is the Arbitrator's finding of "complete lack of evidence of misappropriation," Amdocs Opp'n at 2, 8, 19, as if it meant no misappropriation whatsoever.  But just before that phrase, the paragraph reads:  "With respect to T-Jat's technology that does constitute trade secrets . . . , no evidence was presented that Amdocs ever appropriated such technology." Ex. C at 16.  It then ends with: "the circumstantial evidence presented by T-Jat as proof of trade secret misappropriation is insufficient in light of the complete lack of evidence of

5

misappropriation." *Id.* Again, in context, all the Arbitrator's statement says is that there was no evidence of misappropriation *of trade secrets*; he does not say no misappropriation at all.

### III. ONCE FINDING MANIFEST DISREGARD, THIS COURT SHOULD FIND A BREACH OF THE NDA AND REMAND FOR DAMAGES ONLY

If this Court vacates on the basis of "manifest disregard," a fact finder will have to determine the as yet undetermined issue of whether Amdocs misused the NDA's proprietary information. Amdocs says that determination is "solely the arbitrator's." Amdocs Opp'n at 21. But *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998), suggests otherwise. There, the court found "manifest disregard" and reversed a district court for denying a motion to vacate an arbitration award. Once the court vacated, the issue was whether to remand to the arbitrators to determine issues of disputed fact.[4] The court found that because the evidence in favor of the moving party was "strong," *id.* at 204, and the other party's evidence would have been "extremely hard to accept," a contrary finding by the arbitrators "would have strained credulity." *Id*. Consequently there was no "persuasive reason" for a remand to the arbitrators. *Id.*[5]

The same is true here. In its opening brief, T-Jat described certain relevant facts as undisputed, since they derive, as shown below, from Amdocs documents and Amdocs witnesses. But for purposes of this motion, this court can determine the breach of NDA issue in T-Jat's favor without a remand, despite Amdocs's claim that there are facts in dispute, if T-Jat's position is "strong," and Amdocs's position is "extremely hard to accept" and "strains credulity."

---

[4] The record in that age discrimination case was replete with disputed issues of fact. *See id.* at 199 (the employer "denied" making statements testified to by employee; employer contended that employee opted to retire and was not forced from his job; employer said its conduct was not age discrimination but was "justified by concerns over [employee's] performance and health"; employer was "contradicted" as to key elements of his testimony).

[5] T-Jat does not suggest that *Halligan* allows for judicial review of facts found on the record by an arbitrator. *See Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 214 n.9 (2d Cir. 2002). But here the Arbitrator found no facts on the record regarding the issue of proprietary information, so the situation was akin to the situation in *Halligan* where there was no written opinion by the arbitrators. The common issue is what to do after vacating when there are no relevant findings on the record by the arbitrator.

It would strain credulity for the Arbitrator to find that the knockoff was developed without any T-Jat proprietary information, given the three factual propositions set forth in bold below. The only fact finder to opine on the NDA claim with a correct understanding of the scope of "proprietary information" was Judge Engelmayer, and he said that Amdocs was "likely in breach" of the NDA because it used T-Jat's proprietary information. Tr. at 22:12, ECF No. 40. Judge Engelmayer's preliminary finding was born out by the evidence at the arbitration.[6] Below we present only some of the corroborative evidence for each factual proposition, but are willing to submit a fuller presentation if that would be helpful to the Court. We do not rely on T-Jat witnesses, experts or documents, but solely on Amdocs witnesses and documents:

**Amdocs had access to T-Jat's proprietary information including T-Jat's UCL and its concept, functionalities, features and technology.**

The Arbitrator already decided this in T-Jat's favor: "T-Jat delivered all software required under the OEM Agreement . . . . In addition, T-Jat delivered other *proprietary documents and information* and spent many days on site at Amdocs instructing Amdocs as to the functionality and workings of the software, including the UCL." Ex. C at 7 (emphasis added).[7]

Amdocs tries to argue that T-Jat's confidential information was in the public domain and therefore that whatever it is that T-Jat delivered did not amount to proprietary information under

---

[6] Amdocs tries to escape the many preliminary findings of fact made by Judge Engelmayer in favor of T-Jat by arguing that T-Jat's representations to him were later contradicted at the arbitration hearing. Amdocs Opp'n at 5. As proof, Amdocs claims that T-Jat "egregiously . . . falsely asserted that it had shared all of its human readable source code for its software with Amdocs." *Id.* at 5-6. In this accusation, Amdocs speaks of "source" code, but neglects to mention that T-Jat provided Amdocs with its "object" code. Tr. 150:15-17: [Galon], ECF No. 38. Guy Galon, Amdocs's project manager of LoopMe, conceded before Judge Engelmayer that object code can be converted into source code. *Id.* 151:7-9. In any event, Judge Engelmayer's injunctive order was based, in part, on Amdocs's failure to wall-off any of T-Jat's code from those working on the UC, without any reference to which version of the code. Tr. 21:6-8, ECF No. 40 ("Nor did [Amdocs] attempt to argue . . . that the persons at Amdocs who had access to T-Jat's product and *code* were walled off from the UCS project.") (emphasis added).

[7] *See also, e.g.,* Ex. EE (e-mail dated July 25, 2012, amongst two Amdocs employees stating that Amdocs had received T-Jat's encryption document, API, operations guide, installation guide, Network configuration guide, functional specification, and technical handbook).

the NDA.  Amdocs Opp'n at 21.  But that argument runs squarely up against the Arbitrator's finding above that what T-Jat delivered was "proprietary documents and information."

**The Amdocs personnel who were familiar with T-Jat's UCL proprietary information were responsible for developing the UC knockoff.**

- Even after Amdocs decided to build the UC as a competing product to LoopMe, Matthew Hodgson, the leader of the UC knockoff effort, conceded that Amdocs did not establish a clean room or formal procedures to wall-off T-Jat's proprietary information from those working on the UC. Ex. I 1425:11-13.

- In addition to Hodgson, other individuals that worked on the UC knockoff -- including Guillaume Foret, a UC developer, *id.* 1413:4-7 [Hodgson], and David Baker, a UC senior software developer, *id.* 1524:2-3 [Baker] -- all testified that they either worked on LoopMe or had access to LoopMe.[8]

- Despite recognizing a possible "conflict of interest between [T-Jat] and [UC]," Ex. I 1430:8-10, Hodgson testified that he "was relying" upon those working on both projects to "compartmentalize and partition their roles" in their heads. *Id.* 1433:15-16.

It "strains credulity" to say that these Amdocs employs were able to "compartmentalize and partition" in their heads.  "It is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort my be to do so."  *F.T.C. v. Exxon Cop.,* 636 F.2d 1336, 1350 (D.C. Cir. 1980).

**The Amdocs personnel working on the UC knockoff used T-Jat's proprietary information as a template for developing the knockoff.**

- As stated by numerous Amdocs officials, Amdocs decided to replace T-Jat's system in LoopMe with UC.[9]  One Amdocs official sent another a "summary list of TJAT functionality," and when asked "how can [an internal Amdocs team] benefit from what TJAT already provided . . ?" the response was that there were T-Jat materials that the Amdocs internal team could "reuse."[10]

---

[8]  Ex. N;  Ex. FF; Ex. GG; Ex. HH; Ex. H 1277:12-16 [Ofek]; Ex. I 1418:23-1419:9, 1432:22-1433:3 [Hodgson]; *id.* at 1543:6-12 [Baker].

[9]  Ex. II (In an e-mail dated July 9, 2013, Amir Ofek, an Amdocs VP, stated to Gary Miles at Digital Services: "One key item we will need to address there is the development of social network integration (replacing Tjat)."). Ex. JJ (March 5, 2013 e-mail from Hodgson noting how to make the UC into a product that provides all of the same capabilities as UC).

[10]  Ex. LL (e-mail dated May 17, 2012, amongst two Amdocs employees stating "We don't have the source of TJAT's product, but we do have a set of testing (manual and automated) that we can reuse with internal team.");

8

- With Hodgson's input, Baker, who had been working on LoopMe, wrote UC's merge and de-duplication code -- the features based on T-Jat's proprietary technology -- in four or five days in July 2012.[11] At the arbitration hearing, Baker even testified to the many similarities between the merge and de-duplication features of LoopMe and UC, including UC's use of numeric field comparisons, weighted decision making, a rule-based system, and a scoring mechanism. Ex. J 1593:24-1610:23

The strongest support for the fact that Amdocs used T-Jat's system as a template is the testimony, emails and documents of Hodgson, Amdocs's leader of the UC knockoff project. Hodgson conceded that Amdocs used T-Jat's functionality. Because Amdocs says that T-Jat took the statement "misleadingly . . . out of context," Amdocs Opp'n at 11, here is the context.

On direct, Hodgson denied that anyone on the UC team copied "Tjat technology or know how." Ex. I 1344:20-1345:3. But on cross he was shown an email from 2011, Ex. KK, where he had said "we might conceivably want to build . . . Tjat's contribution . . . such that we can then use it." In the same chain, he said "I'm not convinced that Tjat are very competent; we'd do it for less just using off-the-shelf opensource components and by being smart." *Id*.

When confronted with that email, Hodgson conceded that "Tjat is providing this functionality for FUSE. We are looking at providing similar solutions in-house, just replacing a vendor [i.e., T-Jat]." Ex. I 1381:5-7  He then reiterated: "*Yes, taking the functionality they are contributing and instead implementing it in-house.*" *Id.* 1381:12-14 (emphasis added).

To explain the concession, Amdocs says Hodgson "was not discussing the UC product that is the subject of T-Jat's present motion." Amdocs Opp'n at 11. Well, then, what was he talking about? A second knockoff? The context shows that Hodgson was always thinking of the

---

[11] Ex. I. 1532:22-1533:10 [Baker]; Ex. J 1590:24-1591:19, 1608:23-1609:15 [Baker]. As proof that Amdocs developed the UC independently, it claims that development was spread over five years beginning well before T-Jat entered the picture.. Amdocs Opp'n at 10. But the portion involving the merge and de-dup code -- which is the functionality derived from T-Jat's proprietary information -- was developed by Baker in just days in 2012, well after T-Jat was on board.

9

UC, not a phantom knockoff.  For example, in an July 2013 e-mail, Hodgson said "we should just kill off the fuse backend [including T-Jat] and frontend and replace it with UC."  Ex. II.

Even more compelling: while working on the knockoff, Hodgson and the project manager for LoopMe created a spreadsheet with two of its columns directly comparing thirteen[12] functionalities of T-Jat's system with those of  UC.  Ex. V; Ex. MM.  For each functionality, the spreadsheet lists whether the knockoff achieved the functionality, or was "roadmapped" i.e., yet to be achieved.  In that spreadsheet T-Jat is being used as a template for UC.  T-Jat argued this spreadsheet in its opening brief, but Amdocs failed to respond in its opposition.

In short, Amdocs's own evidence proves that there was no independent development of the UC. Amdocs created the UC knockoff relying on T-Jat's proprietary information.  Any contrary conclusion would "strain credulity."  Upon vacating for "manifest disregard," this Court is empowered to make that finding.

## IV.    CONCLUSION

Applying the "manifest disregard" standard, the Court should vacate the relevant portion of the award, find that Amdocs breached the NDA, reinstate the causes of action that the Arbitrator found were tied to the NDA claim, and remand to arbitration for damages. Alternatively, if the Court finds that Amdocs has demonstrated an issue of fact with respect to breach of the NDA, it should remand that issue (and the associated causes of action) to arbitration, with instructions for the claims to be re-determined in light of *all* the terms of the NDA.

---

[12] In our opening brief we said twelve. T-Jat Mot. at 11. We double-checked and it is actually thirteen.

Dated: Washington, D.C.
August 8, 2014

/s/ Baruch Weiss
Baruch Weiss
Arnold & Porter LLP
555 Twelfth Street, NW
Washington, D.C. 20004-1206
(202) 942-6819
(202) 942-5999 (fax)
Baruch.Weiss@aporter.com

ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022

*Counsel for Plaintiff T-Jat Systems 2006 Ltd*